1  HOFFMAN EMPLOYMENT LAWYERS, LLP
2  Michael Hoffman SBN 154481
   Chad Pradmore SBN 284615
3  580 California Street, Suite 1600
   San Francisco, CA 94104
4  Tel  (415) 362-1111
   Fax  (415) 362-1112
5
6  Attorneys for Plaintiff
   CHARLES BREWER
7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  **CHARLES BREWER**                    CASE NO.: CV 12-2363-LB

12         Plaintiff,                     **PLAINTIFF'S OPPOSITION TO
                                          DEFENDANT'S MOTION FOR
13         vs.                            SUMMARY JUDGMENT OR PARTIAL
                                          SUMMARY JUDGMENT**
14
    **GENERAL NUTRITION**                 Date:   April 3, 2014
15  **CORPORATION**,  a Pennsylvania      Time:   9:30
    corporation,                          Ctrm:   C
16
           Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

I.   INTRODUCTION ..................................................................................................... 2

II.  FACTUAL STATEMENT ...................................................................................... 2

  A. Mr. Brewer Preforms his Job Satisfactorily and is Promoted............................ 2

  B. Mr. Brewer Complains About Discrimination in the Workplace ....................... 3

  C. Mr. Brewer Complains of Defendant's Unlawful Wage and Hour Policies....................... 4

  D. Defendant Retaliates Against Mr. Brewer for Making Complaints ................... 6

  E. Defendant's Stated Reason of "Time Fraud" is False and Pretextual.................... 7

  F. Defendant's Stated Reason of "Product Theft" is False and Pretextual................. 8

  G. Defendant's "Investigation" was Biased and Lacked Impartiality .................... 9

  H. Mr. Brewer Exhausted His Administrative Requirement by Filing a Complaint with the DFEH .... 11

III. STANDARD FOR SUMMARY JUDGMENT .................................................. 11

IV.  LEGAL ANALYSIS: RETALIATION ................................................................ 12

  A. Plaintiff Has Established a *Prima Facie* Case of Retaliation ........................... 12

  B. Plaintiff Has Shown that Defendant's Stated Reasons Were Pretextual .................... 13

V.   LEGAL ANALYSIS: FEHA DISCRIMINATION CLAIMS ............................. 14

  A. The McDonnell Douglas Standard Is Inappropriate as Plaintiff has Direct Evidence of

  Discrimination ..................................................................................................... 14

  B. Plaintiff Can Meet the McDonnell Douglas Test.............................................. 15

VI.  PUNITIVE DAMAGES ........................................................................................ 16

VII. CONCLUSION ...................................................................................................... 18

Brewer v. GNC Corporation
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL
SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adickes v. S.H. Kress & Co.*

  398 U.S. 144 .................................................................................................. 12

*Aguilar v. Atlantic Richfield, Co.*

  (2001) 25 Cal.4th 826 ................................................................................... 12

*Bains LLC v. Arco Products Co., Div. of Atlantic Richfield Co.*

  405 F3d at 773 .............................................................................................. 18

*Barbosa v. Impco Tech., Inc.*

  (2009) 179 CA 4th 1116 ............................................................................... 13

*California Fair Employment & Housing Com. v. Gemini Aluminum Corp*

  (2004) 122 Cal. App. 4th 1004 ..................................................................... 14

*Chavez v. Thomas & Betts Corp.*

  (10th Cir. 2005) 396 F3d 1088 .................................................................... 17

*Commodore Home Systems, Inc. v. Sup.Ct.*

  (1982) 32 C3d 211 ....................................................................................... 17

*DeJung v. Superior Court*

  (2008) 169 Cal.App.4th 533 ........................................................................ 15

*Flait v. North American Watch Corp.*

  (1992) 3 Cal.App.4th 467 ............................................................................. 14

*Green v. Ralee Eng. Co.*

  (1998) 19 C4th 66, 87 .................................................................................. 13

*Guz v. Bechtel Nat'i. Inc.*

  (2000) 24 Cal.4th 317 .................................................................................. 16

*Hersant v. Department of Social Services,*

  (1997) 57 Cal.App.4th 997 .......................................................................... 16

*Hertzberg v. SRAM Corp.*

Brewer v. GNC Corporation
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL
SUMMARY JUDGMENT

(7th Cir. 2001) 261 F3d 651 ................................................................ 17

*Horn v. Cushman & Wakefield Western, Inc.*

 (1999) 72 Cal.App.4th 798 ............................................................ 12

*Kolstad v. American Dental Ass'n,*

527 US at 536 ................................................................................. 17

*Morgan v. Regents of University of California*

(2000) 88 Cal.App.4th 52 ......................................................... 13, 14

*McDonnell Douglas Corp. v. Green*

(1973) 411 U.S. 792 ...................................................................... 16

*Nazir v. United Airlines, Inc.*

(2009) 178 Cal.App.4th 243 .......................................................... 12

*Staub v. Proctor Hosp.*

(2011) 131 S.Ct. 1186 .................................................................... 13

*Trans World Airlines, Inc. v. Thurston*

(1985) 469 U.S. 111 ...................................................................... 15

*Zhang v. American Gem Seafoods, Inc.*

(9th Cir. 2003) 339 F3d 1020 ........................................................ 17

**Statutes**

CCP § 437c ....................................................................................... 16

Code Civ. Proc. § 437c(e) ................................................................. 12

Fed. R. Civ. P. 56(c) ........................................................................ 12

iv

## I.    INTRODUCTION

Plaintiff Charles Brewer brings this action against his former employer, Defendant General Nutrition Corporation ("GNC").  Mr. Brewer is an African American male.  Mr. Brewer was an outspoken proponent of employee rights at GNC.  Mr. Brewer engaged in protected activity in the workplace.  Mr. Brewer repeatedly complained to management about Defendant's unlawful wage and hour policies and practices, requesting that he be compensated for hours worked and reimbursed for business expenses.  Mr. Brewer also repeatedly complained to management about racial discrimination in the workplace.  Defendant did nothing to investigate Mr. Brewer's claims.  Instead, and as a condition of continued employment, Mr. Brewer was required to endure a hostile work environment and suffer wage and hour violations.  Mr. Brewer was terminated on May 13, 2011.

Defendant states two pretextual reasons for Mr. Brewer's termination:  (1) that Mr. Brewer committed "time fraud" by adjusting his timecards and (2) that Mr. Brewer committed "theft" by using a promotional product from the store valued at $7.99.  Defendant's stated reasons for terminating Mr. Brewer are false because (1) making adjustments to timecards is standard operating procedure at GNC and GNC cannot prove its "time fraud" allegations (2) GNC supervisors routinely give away promotional products to employees like Brewer.

## II.    FACTUAL STATEMENT

### A.    Mr. Brewer Preforms his Job Satisfactorily and is Promoted

In April of 2011, in recognition of Mr. Brewer's hard work and dedication, Mr. Brewer was promoted to Assistant Manager of the Hillsdale Store.  [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 27:17-28:6]  Before being terminated, Mr. Brewer had no previous employment disciplinary actions taken against him.  [Brewer Decl. ¶ 4]  Mr. Brewer was terminated in May 2011, shortly after his promotion.

/ / /

/ / /

/ / /

## B. Mr. Brewer Complains About Discrimination in the Workplace

### 1. Mr. Brewer's Manager Consistently Makes Racist Remarks in the Workplace

Mr. Brewer and another African American employee were subjected to a steady stream of bigotry and stereotyping in the workplace. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 42:16-24] On the day Mr. Brewer was hired, his manager, Carol Owens, told Mr. Brewer that "she was never about black people" and that she didn't have any black friends. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 45:20-46:6] From that point forward, racially insensitive commentary persisted and intensified.

Owens told Mr. Brewer that African Americans purchase Inositol from GNC to mix with cocaine before they sell it. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 40:17-44:24] Owens told Mr. Brewer that African Americans buy certain GNC products to cleanse their urine to pass drug-screening tests. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 47:1-49:1] On at least three occasions, Owens told Mr. Brewer that "black men" are big and stocky, implying that African Americans are intimidating. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:1-44:24] On occasions when products would come up missing, Owens consistently said that either the "Hispanic guy" or "the black guy took it." [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 49:2-50:2] Owens even told Mr. Brewer that she doesn't bother asking African American or Hispanic customers for their email addresses because "black people don't use email" and because Mexicans don't have email because they are here illegally. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 52:4-13; 89:4-18]

On one occasion, a white man purchased Inositol. In an effort to understand Owens, Mr. Brewer asked Owens, "what do you think he is buying it for?" [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 41:11-16] Owens made no reference to a belief that white people by Inositol in connection with cocaine. *Id.* Owens only referenced that belief when an African American or other minority purchased Inositol. [Brewer Decl. ¶ 6]

/ / /

/ / /

2. <u>Mr. Brewer Complains to Management of Racism in the Workplace; Management Fails to Investigate</u>

Mr. Brewer told Owens on several occasions that what she was saying was not only racist and offensive but also unlawful. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 41:15-42:15; 48:9-17] Despite Mr. Brewer's complaints, Owens continued to make racially insensitive and derogatory comments. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:5-24]

Michelle Murray, the regional sales director, visited Brewer's store prior to his termination. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:13-24] During this visit, Murray said to Mr. Brewer "I heard that you were going to sue." [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:13-24] Mr. Brewer explained to Murray that he never told Owens that he was going to sue, only that her numerous racial slurs were offensive. [Brewer Decl. ¶ 6] Mr. Brewer told Murray that Owens continued to make racial slurs after being told the comments were offensive. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:14-44:24] Mr. Brewer is not aware of any investigation into his complaints of racial discrimination, nor has Defendant produced any documents pertaining to an investigation into Mr. Brewer complaints. [Brewer Decl ¶ 7; Pradmore Decl. ¶3]

**C. Mr. Brewer Complains of Defendant's Unlawful Wage and Hour Policies**

Mr. Brewer complained to his supervisors that he should not be required to work off-the-clock and that the company was legally obligated to reimburse him for required business related expenditures. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 65:17-67:25] In response to his complaints he was told by his immediate supervisors, Crystal Fenech, Carol Owens and Brian LeBreton that they were following standard procedure. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 65:17-67:22; 78:23-20] When nothing was done to address his concerns, Mr. Brewer followed GNC's internal complaint procedures and sent a letter to his supervisor's manager, Regional Sales Director ("RSD") Michelle Murray, detailing Defendant's nonexistent bank deposit compensation and reimbursement policy. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. at 66:11-19]

To provide a backdrop for Mr. Brewer's wage and hour complaints, a brief description of Defendant's Bank Deposit, Reimbursement, and meal and rest break policies and procedures are set forth below. These wage and hour issues are being litigated in the pending related class action case, *Brewer et al. v. GNC,* Case No. 11-cv-03587-YGR.

### 1. GNC Does Not Pay for All Hours Worked

GNC requires employees to deposit monies collected during business hours at an off-site third-party bank on a nightly basis. [Pradmore Decl. ¶ 4, Ex. 1] GNC provides no training nor does GNC have any procedures in place to compensate and reimburse its employees for this off-the-clock work. [Pradmore Decl. ¶ 5, Ex. 2, 30(b)6 Deposition at 54:1-20; Pradmore Decl. ¶ 24-27, Ex.17] As a result, Brewer and other employees are not paid for all hours worked. [Pradmore Decl. ¶ 25, Ex. 17] Mr. Brewer specifically complained about off-the-clock work. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 69:2-17] GNC did nothing in response to these complaint; instead GNC retaliated against Brewer by terminating him.

### 2. GNC Does Not Reimburse its Employees for Automobile Expenses

To make bank deposits, Mr. Brewer and Defendant's employees drive to the bank using their personal vehicles but they are not reimbursed for automobile expenses.[1] [Pradmore Decl. ¶ 26, Ex.17] GNC's Director of Compensation distributed a memorandum to California management employees stating that "[a]ll GNC employees who are asked to drive their own car for business purposes will be *eligible* for [] reimbursement." [Pradmore Decl. ¶ 7: Ex. 4] This policy violates California law because indemnification is not "optional" and cannot be waived. (Labor Code § 2804) Mr. Brewer specifically complained about not being indemnified for business expenses. [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 69:2-17] GNC did nothing in

---

[1] In response to discovery requests in the related class action, GNC produced "Expense Reimbursement Forms" submitted by all similarly situated employees. Of these 1,083 pages of documents, only 163 documents reference the word "bank." Only 17 unique employee names appear on these 163 documents that reference the word "bank." Defendant has hundreds of stores across California, it is therefore implausible that only 17 employees incurred business expenses on behalf of Defendant. [Pradmore Decl. ¶ 8]

response to these complaints; instead GNC retaliated against Brewer by terminating him.

**GNC Commits Other Wage and Hour Violations**

As set forth in the related pending action, *Brewer et al. v. GNC,* Case No. 11-cv-03587-YGR, Brewer suffered an array of other wage and hour violations, including GNC's failure to timely pay final wages, GNC's failure to provide accurate and complete wage statements, GNC's failure to provide meal and rest periods (or premium pay in lieu of meal and rest periods), among other things. Plaintiff respectfully requests that the Court take judicial notice of Plaintiffs' Motion for Class Certification in that matter (*Charles Brewer* v. *General Nutrition* Corporation, Case No. 11-CV-03587, Dkt. 106).

### D. Defendant Retaliates Against Mr. Brewer for Making Complaints

After Mr. Brewer complained about to Owens his scheduled hours were cut, he was given more weekend and evening shifts, harassment intensified and then he was terminated. [Brewer Depo. 91:19-92:22] Because the harassment continued, Mr. Brewer then complains to her supervisor Michelle Murray. Similarly, Murray made conducted no investigation into Mr. Brewer complaints. On February 22, 2011 with few remaining options, Mr. Brewer went to the Human Resources Department and complained. [Brewer Depo. 94:1-95:1] In response, to Mr. Brewer contacting Murray became aggressive and told him that he cannot go to HR for anything. [Brewer 97:12-24]

This is in direct conflict with Defendant's "Code of Conduct" policy contained in its Retail Operations Manual which states, that employees are permitted to go to HR. Under this code of conduct "[e]mployees who report incidents of discrimination or harassment or assist in any inquiry will be protected against retaliation.[2] The prohibition against retaliation includes…

---

[2] Defendant's definition of harassment includes verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color… and that (1) has the purpose or effect of unreasonably interfering with an individual's work performance, (2) has the purpose or effect of creating an intimidating, hostile, or offensive work environment or (3) otherwise adversely affects an individual's employment opportunities Harassing conduct includes, but is not limited to: epithets, slurs or negative stereotyping.

any discrimination in terms of pay, advancement, opportunities, or termination." [Pradmore Decl. ¶ 9, Ex. 5]  Despite this prohibition, Mr. Brewer was subjected to increased harassment, loss of pay, and three months later termination.

### E.     Defendant's Stated Reason of "Time Fraud" is False and Pretextual

#### 1.     Employees Routinely Adjust their Timecards

On May 13, 2011, Shannen Stenerson, an agent from Defendant's loss prevention department, interviewed Mr. Brewer regarding specific adjustments made to his times sheet. [Pradmore Decl. ¶10, Ex. 6]  These adjustments are referred to as "Manager Corrections to Clockings."  Defendant's policy states that employees are required to adjust clockings to show all hours worked and that employees are permitted to adjust clockings to reflect the time they worked.  [Pradmore Decl. ¶ 11, Ex. 7]  Plaintiff has obtained many declarations from employees stating that either they or their managers regularly make adjustments to their clockings, often to appear compliant with wage and hour laws. [Pradmore Decl. ¶ 28, Ex. 17]  In fact, Fenech herself made numerous corrections to clocking times, including corrections for breaks, clock in times and clock out times, as evidenced by the asterisks on her final payroll report.  [Pradmore Decl. ¶ 12, Ex.8]

#### 2.     Stennerson States No Facts to Support Her Conclusion that Mr. Brewer "Stole" One Hour and a Half on May 1, 2011[3]

Defendant's primary accusation against Mr. Brewer is that on May 1, 2011, he allegedly changed his time to reflect "that he started his shift at 11:30 a.m." [Pradmore Decl. ¶10, Ex. 6]  Stenerson's report states that Mr. Brewer was "specifically" questioned about his time sheet clocking for that day. [Pradmore Decl. ¶10, Ex. 6]  Stennerson concludes, without a single supporting fact, that on May 1, 2011 she was able to determine that Mr. Brewer clocked in at 1:00 p.m. and then changed his time to 11:30 a.m.  *Id.*  Similarly, Defendant's Motion cites zero facts as to how Stennerson "was able to determine" that Mr. Brewer clocked in at 1:00 p.m. and

---

[3] Incidentally, May 1, 2011 was the day Brewer was promoted to full time assistant manager. [Dkt. 41, ¶ 7]

then changed his time to 11:30 a.m. [Dkt. 36] Plainly, there are just no records supporting this allegation.

There are, however, records showing that Mr. Brewer did not change his time on May 1, 2011. [Pradmore Decl. ¶ 16, Ex. 11] As stated above, Defendant has produced the records showing changes made to employee clocking times. In reviewing that data, there is no record of the alleged "change" from 11:30 to 1:30 on May 1, 2011. [Pradmore Decl. ¶ 16, Ex. 11] There is only one record showing a change being made to Mr. Brewer's clockings on May 1, 2011 -- and that change was made to his clock-out time, not his clock-in time (as alleged in Stenerson's report). [Pradmore Decl. ¶ 16, Ex. 11] Furthermore, that adjustment was made by someone other than Mr. Brewer. [Pradmore Decl. ¶ 16, Ex. 11] This is another example demonstrating that the investigation was not thoroughly conducted and that the "time fraud" allegation was mere pretext.

3.     <u>Defendant's "Eye Witness" Did Not Punch In on the Day in Question</u>

Stennerson also accuses Mr. Brewer of stealing time on May 8, 2011. Her report states that on May 8, 2011, Mr. Brewer's co-worker Kyrolos Elgendy reported to work at 11:30 a.m. and punched in on time. *Id.* The report states that Kyrolos said that Mr. Brewer was also scheduled to start his shift at 11:30, but that when Elgendy arrived, Mr. Brewer had not arrived. *Id.* Elgendy is further cited as stating that on May 8, 2011, Brewer didn't show up until 1:30 p.m. *Id.* However, in reviewing punch data provided by Defendant, there is no record of Kyrolos ever punching in on May 8, 2011. [Pradmore Decl. ¶ 15, Ex. 10] Therefore, Kyrolos was not present in the store and would have no way of knowing what time Mr. Brewer arrived. This is another example demonstrating that the investigation was not thoroughly conducted and that the "time fraud" allegation was mere pretext.

**F.**     **Defendant's Stated Reason of "Product Theft" is False and Pretextual**

1.     <u>Employees are Frequently Given Promotional Products</u>

Defendant uses promotional products to educate its employees about products the company sells. [Neal Decl. ¶¶ 5-7; Bruns Decl. ¶¶ 5-7] On numerous occasions during Mr.

Brewer's employment with Defendant, his supervisor, Carol Owens, would personally give employees sample products to test in an effort to inform the Sales Staff of the products they were selling. [Pradmore Decl. ¶ 6, Ex. 3: Brewer Depo. 36:10-14] This practice is not limited to Ms. Owens – GNC managers at other retail store locations routinely give employees sample products. Mr. Brewer has obtained declarations from other GNC employees stating this. [Neal Decl. ¶¶ 5-7; Bruns Decl. ¶¶ 5-7]

## 2. There are No Written Policies Regarding Employee Use of Promotional Products

Defendant does not claim that Mr. Brewer stole a saleable product from the shelves. Instead, Defendant accuses Brewer of taking a free promotional product. [Pradmore Decl. ¶ 16, Ex. 11] However, as stated above, it is common practice for these products to be distributed to employees. Defendant has provided no written policy prohibiting managers from giving promotional products to employees or regarding employee use of promotional products. [Pradmore Decl. ¶ 17]

## G. Defendant's "Investigation" was Biased and Lacked Impartiality

Mr. Brewer noted contemporaneously with the investigation that Ms. Stennerson did not conduct an objective investigation and, in fact, was disrespectful and appeared to have made up her mind about terminating him prior to the interview. [Pradmore Decl. ¶ 18, Ex. 12] In addition, on May 13, 2011, before being terminated, Mr. Brewer sent Bill Roller, inventory manager, Marion Wagner (Human Resource Director), Tony Kuniak (Director of Loss Prevention), and Lorri Murphy (Corporate Loss Prevention Manager) describing how the investigation into allegations of time fraud and product theft were biased and subjective. [Pradmore Decl. ¶ 29: Ex. 18] The following inconsistencies below highlight Stennerson's failure to conduct an unbiased investigation.

/ / /

/ / /

/ / /

1.  Mr. Brewer Told Ms. Stenerson That His Manager Approved of Employees Testing Promotional Products

Mr. Brewer stated that Owens approved of his testing promotional products. [Pradmore Decl. ¶ 19, Ex. 13] Stennerson's biased investigation is evidenced by her failure to interview Owens to see if Owens had in fact previously approved of Mr. Brewer testing promotional products. Instead of questioning Owens to determine if she permitted Mr. Brewer, and other employees, to use promotional items for personal use, Stenerson had her mind made up that Mr. Brewer's use of promotional products was theft.

2.  Mr. Brewer Told Ms. Stennerson that he was Trained by Owens to Adjust his Clocking Entries

Mr. Brewer stated in told Stennerson he would have to adjust his time to add breaks that he hadn't actually taken. [Pradmore Decl. ¶10, Ex. 6] He stated in his Pre-Complaint Questionnaire conducted by the DFEH he was required to work off-the-clock and that this is a result of two issues, (1) being required to clock-out before taking the deposits to the bank at the end of his shifts, and (2) Defendant's policy of only giving employees breaks when customer flow allowed. [Pradmore Decl. ¶ 18, Ex. 12] Mr. Brewer stated that he was trained by his manager to make these corrections to clockings. [Pradmore Decl. ¶ 19, Ex. 13] This is corroborated by Defendant's own policy that employees are responsible to record their own time to ensure that it is correct. [Pradmore Decl. ¶ 11, Ex. 7] It is further corroborated by the numerous of declarations submitted by employees in support of Plaintiff's class action against Defendant stating that they themselves or their managers would frequently make adjustments to employee clockings. [Pradmore Decl. ¶ 28, Ex. 17]

3.  Ms. Stenerson Supplied No Evidence that the Eye Witness Worked the Day in Question or that Mr. Brewer Made the Alleged Correction

As stated above, Defendant's punch records make no mention of any records showing that Mr. Elgendy actually worked on May 1, 2011 or that Mr. Brewer change his punch time from 1:30 p.m. to 11:30 a.m. In Stennerson's report she states that, "[t]otal time was difficult to determine a loss [sic], but on 5/1/2011 I was able to determine that Brewer received payment for

an hour and half that he did not work." In support of this belief, she cites in her declaration to the hearsay statement of Mr. Elgendy. [Dkt. No. 40]

### H. Mr. Brewer Exhausted His Administrative Requirement by Filing a Complaint with the DFEH

On August 4, 2011, Mr. Brewer filed a complaint with the Department of Fair Employment and Housing Commission ("DFEH"). On September 9, 2011, Mr. Brewer received a Notice of Case Closure. [Pradmore Decl. ¶ 20, Ex. 14] On November 1, 2011, less than seven months from the date of his termination Mr. Brewer filed a second complaint with the DFEH claiming that his termination was retaliatory and that he was discriminated against based on race. On that same day, the DFEH issued a Right-To-Sue Notice. [Pradmore Decl. ¶ 21, Ex. 15] On May 10, 2012, well within the one-year statute of limitation prescribed by Gov't Code Section 12948, Mr. Brewer filed his Judicial Complain in this Court. [Pradmore Decl. ¶ 22 ]

## III. STANDARD FOR SUMMARY JUDGMENT

On a motion for summary judgment, the moving party bears the burden of showing the absence of a genuine issue of material fact, and any evidence and inferences must be viewed in the light most favorable to the non-movant. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.* 398 U.S. 144, 158-59 (1970). Because "[a]n employer's true motive in an employment decision is rarely easy to discern," the Ninth Circuit has held that such inquiry should be left to the trier of fact to conduct a "searching inquiry into these motives, those [acting for impermissible motives] could easily mask their behavior behind a complex web of post hoc rationalization." *Stegall v. Citadel Broad. Co.* (9th Cir. 2003) 350 F.3d 1061, 1072-1073.

Typical employment case issues, such as intent, motive, and hostile working environment "are rarely appropriate for disposition on summary judgment." *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 285-86. A 437(c). The court's function at the summary judgment stage is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. Code Civ. Proc. § 437c(e); *Aguilar v. Atlantic Richfield, Co.* (2001) 25 Cal.4th 826, 843. Rather, the evidence presented, and inferences to be drawn therefrom, must be

11

viewed in a light most favorable to the nonmoving party. *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798. Any "evidentiary doubts or ambiguities [are resolved] in plaintiff's favor." *McCaskey v. California State Auto. Assn.* (2010) 189 Cal.App.4th 947, 956. The Court must "accept as true the facts...in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.

## IV.    LEGAL ANALYSIS: RETALIATION

A *Prima facie* case requires a showings that (1) Plaintiff engaged in protected activity, (2) was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Flait* at 476; *Porter* at 894.

### A.    Plaintiff Has Established a *Prima Facie* Case of Retaliation

Firing an employee for asserting a *reasonable* claim in *good faith* may be actionable even if the employee fails to prove the employer actually violated the law: "As long as the employee makes the ... complaint in good faith, it does not matter for purposes of a wrongful termination action whether the complaint identifies an actual violation of (workplace) statutes or regulations." *Barbosa v. Impco Tech., Inc.* (2009) 179 CA4th 1116, 1123. "(A)n employee need not prove an actual violation of law; it suffices if the employer fired him (the employee) for reporting his 'reasonably based suspicions' of *illegal* activity." *Green v. Ralee Eng. Co.* (1998) 19 C4th 66, 87. In retaliation cases, the employer is liable even if the ultimate decision-maker harbored no animus where the decision-maker engages in an employment action motivated by another supervisor's animus that is intended to cause an adverse employment action, and that action is the proximate cause of the employee's termination. *Staub v. Proctor Hosp.* (2011) 131 S.Ct. 1186, 1194.

Mr. Brewer's internal complaints were reasonable. This is evidenced by the fact that the class action brought bought by Mr. Brewer was ordered to be conditionally certified. In that order the court "conclude[d] that Plaintiff has satisfied his burden to make 'substantial

allegations' and a 'factual showing' that he and other GNC Sales Associates and Assistant Managers were 'victims of a common policy or plan that violated the Law'." [Pradmore Decl. ¶ 23, Ex. 16 at 6:14-17] On May 13, 2011, Michelle Murray retaliated against Mr. Brewer by engaging terminating Mr. Brewer.

### B.  Plaintiff Has Shown that Defendant's Stated Reasons Were Pretextual

A plaintiff can prove pretext either (1) by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) by showing that unlawful discrimination more likely motivated the employer. *Morgan v. Regents of University of Cal*. (2000) 88 Cal.App.4th 52, 68. For example, in *California Fair Employment & Housing Com. v. Gemini Aluminum Corp.*, the court found the proffered reason for an adverse action to be both unbelievable and evidence of pretext because it contradicted the available evidence. (2004) 122 Cal. App. 4th 1004, 1023; *see also Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 479.

Mr. Brewer has produced sufficient contradictory evidence to raise a triable issue of fact. As listed below, pretext is evidenced by Defendant's prior comments and actions, the timing of the termination, the inconsistencies in Defendant's policies, and Defendant's narrative of Mr. Brewer's alleged time clocking violations:

- Owens told Stennerson that she believed that Mr. Brewer was going to sue as a result of her racial comments and retaliated against him by cutting his scheduled hours after he complained about her comments; [Pradmore Decl. ¶ 6: Ex. 3, Brewer Depo. 43:13-24]

- Mr. Brewer made reasonable and legitimate complaints to his Regional Sales Director, Michelle Murray, about racial comments and unlawful employment policies;

- Michelle Murray terminated Mr. Brewer after these complaints;

- The temporal relationship between Mr. Brewer termination and the protected activity is shown by the short amount of time between his complaints and his termination, three months;

- Defendant offers no evidence that on May 1, 2011 Mr. Brewer committed time fraud;

13

- Defendant's narrative is not supported because the name of the employee claiming to have witnessed Mr. Brewer's time violation isn't on Defendant's corresponding "punch sheet" for the day in question;

- Defendant's policy requiring that employees adjust their time sheets in order to be paid for all time worked is inconsistent with Defendant's stated reason that Mr. Brewer committed "time fraud" by adjusting his time sheet;

- Defendant has produced no record a Manager Adjustment of Clocking made by Mr. Brewer on the day in question;

- Defendant's second stated reason is inconsistent with its practices because Mr. Brewer and other employees state that they are frequently permitted to take promotional products home;

- Defendant's second stated reason is inconsistent with its policies because Defendant has no policy prohibiting employee use of promotional products.

Each of these present triable issues of fact regarding the legitimacy of Defendant's stated reasons for terminating Mr. Brewer.

## V. LEGAL ANALYSIS: FEHA DISCRIMINATION CLAIMS

### A. The McDonnell Douglas Standard Is Inappropriate as Plaintiff has Direct Evidence of Discrimination

Although Defendants apply the McDonnell Douglas test in their Motion, "it is inapplicable where the plaintiff presents direct evidence of discrimination." *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 549; *Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121. Direct evidence is that which proves the fact of discriminatory animus without inference or presumption. *DeJung* at 550. For example, direct evidence was found in *DeJung* when a supervisor stated that the plaintiff was denied return to a full time position because "they want somebody younger, maybe in their 40's." *Id*.

The numerous racially derogatory comments made by Mr. Brewer's supervisor is direct evidence of discriminatory animus.

- "[I] was never about black people" and I don't have any black friends; [Brewer Depo. 45:20-46:6]

14

- African Americans purchase Inositol from GNC to mix with cocaine before they sell it; [Brewer Depo. 40:17-44:24]

- African Americans buy certain GNC products to cleanse their urine to pass drug-screening tests; [Brewer Depo. 47:1-49:1]

- "Black men" are big and stocky; [Brewer Depo. 43:1-44:24]

- Numerous accusations of theft that included statements including "the black guy took it;" [Brewer Depo. 49:2-50:2]

- "Black people don't use email" and Mexicans don't have email because they are "here illeall[y];" [Brewer Depo. 52:4-13; 89:4-18]

These comments are direct evidence of Owens' racial animus against African Americans.

## B.     Plaintiff Can Meet the McDonnell Douglas Test

Plaintiff, however, can also meet the *McDonnell* test for their Title VII and FEHA discrimination claims. *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802; *see also Guz v. Bechtel Nat'i. Inc.* (2000) 24 Cal.4th 317, 354-56. Under either statute, a defendant seeking summary judgment bears the initial burden to produce evidence that: 1) negates an essential element of the plaintiffs' claim, or 2) establishes a complete defense by showing some legitimate, nondiscriminatory reason for the action taken against the employee. CCP § 437c. It is only after this burden is met that a plaintiff must respond with evidence raising a triable issue. *See* CCP § 437c(p)(2). Defendants' attempt to negate Plaintiff's discrimination claims by arguing (1) that Mr. Brewer committed "time fraud" by adjusting his timecards and (2) that Mr. Brewer committed "theft" by taking a promotional product from the store valued at $7.99.

Mr. Brewer, is African American and therefore a member of a protected class. He was satisfactorily performing his job under any standard as evidenced by the fact that Defendant recently promoted him to assistant manager.

Defendants contend they have legitimate, nondiscriminatory reasons for Mr. Brewer's termination. However, such reasons must be disregarded when an employee demonstrates "such weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Hersant v. Department of Social Services*, (1997) 57 Cal.App.4th 997, 1005 (internal quotes omitted).

Here, and as explained above, Mr. Brewer had his hours cut, his supervisor approved his use of promotional items, there is no record of the eye witness to the time fraud being present on the day in question, there is no record of Mr. Brewer making the alleged change in his clocking, and two weeks after complaints were made Mr. Brewer Regional Sales Director, Michelle Murray, terminated him. [Section IV(B)] This is sufficient evidence to create a genuine issue of material fact as to pretext.

## VI.    PUNITIVE DAMAGES

Punitive damages may be awarded in civil actions for FEHA violations *Commodore Home Systems, Inc. v. Sup.Ct. (Brown)* (1982) 32 C3d 211, 221; *Myers v. Trendwest Resorts, Inc.* (2007) 148 CA4th 1403, 1435–1436.   "Malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law: "(A)n employer must at least discriminate in the face of a *perceived risk* that its actions will violate federal law to be liable in punitive damages." *Kolstad v. American Dental Ass'n*, 527 US at 536, (emphasis added); *Bryant v. Aiken Regional Med. Ctrs., Inc.* (4th Cir. 2003) 333 F3d 536, 548. Managers' description of coworker's remarks as "inappropriate," "incorrect" and/or "offensive" permitted inference that managers understood such comments might be *illegal. Hertzberg v. SRAM Corp.* (7th Cir. 2001) 261 F3d 651, 662.  Employer's written policies, posted on bulletin boards throughout the workplace, specifically prohibited sexual harassment showed the employer was fully aware of prohibitions against sexual harassment. *Chavez v. Thomas & Betts Corp.* (10th Cir. 2005) 396 F3d 1088, 1097–1099.

An employer's conduct need not be independently egregious to support a punitive damages award. But proof of the employer's egregious misconduct may serve as evidence supporting an inference of the employer's "malicious" or "reckless" state of mind. *Kolstad v. American Dental Ass'n*, supra, 527 US at 538; *Zhang v. American Gem Seafoods, Inc.* (9th Cir. 2003) 339 F3d 1020, 1041.  An employer may be held vicariously liable for punitive damages

where a supervisor backs up an employee's racially motivated conduct instead of protecting the victim from the employee, "even if the supervisor's motivation was non-racial such as loyalty to his subordinates or a desire to avoid conflict within the company." See *Bains LLC v. Arco Products Co., Div. of Atlantic Richfield Co.* 405 F3d at 773–774.

Mr. Brewer is entitled to punitive damages. While working under Owen's supervision Mr. Brewer was subjected to racially discriminatory and harassing comments on a routine basis. [Section II(B)(1)] Mr. Brewer notified Owen's and the Murray that Owens' conduct was unlawful. [Section II(B)(2)] Defendant's knowledge that Owen's behavior was unlawful is was evidence by Murray's comment, "I heard you were going to sue," and Defendant's anti-discriminatory and anti-harassment policy. [Section II(B)(2)] Defendant should be held liable for punitive damages because Murray ratified Owens' behavior by not disciplining her. Furthermore, Murray failed to protect Mr. Brewer from the unlawful conduct and instead terminated him.

In addition, on May 13, 2011, before being terminated, Mr. Brewer sent Bill Roller, inventory manager, Marion Wagner (Human Resource Director), Tony Kuniak (Director of Loss Prevention), and Lorri Murphy (Corporate Loss Prevention Manager) describing how the investigation into allegations of time fraud and product theft were biased and subjective. [Pradmore Decl. ¶ 29: Ex. 18] Defendant's failure to respond to Mr. Brewer letter, despite having knowledge unlawful treatment is ratification of Owen's racial remarks and Stennerson's bias investigation.

As a result of Defendant's conduct Mr. Brewer became increasingly depressed, he not eating properly, losing weight, and spending most of his free time emotionally trapped in his house. Despite never before been diagnosed with depression, his doctor diagnosed him with major depression disorder and prescribed him anti-depressant medication during this employment with Defendant.

/ / /

/ / /

**VII.   CONCLUSION**

Mr. Brewer was a dedicated employee who tried to make sense of a dysfunctional working environment that permitted racist remarks and required employees to endure unlawful wage and hour practices.  At the time Defendant found that it would be easier to terminate Mr. Brewer instead of correcting the practices that he complained about.  This is retaliation.  For this and the foregoing reasons, Defendant's Motion for Summary Judgment must be denied.

Respectfully submitted,

DATED: March 13, 2014                    HOFFMAN EMPLOYMENT LAWYERS, LLP

Michael Hoffman
Leonard Emma
Chad Pradmore
Attorneys for Plaintiff CHARLES BREWER