1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

CHARLES BREWER,

               Plaintiff,

   v.

GENERAL NUTRITION CORPORATION,

               Defendant.

_____/

No. C 12-02363 LB

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF No. 52]

## INTRODUCTION

In this action, plaintiff Charles Brewer has sued his former employer, General Nutrition Corporation ("GNC"), for race discrimination, age discrimination, and retaliation. *See* Complaint, ECF No. 1.[1] GNC moves for summary judgment on all of Mr. Brewer's claims and his request for punitive damages. *See* Motion, ECF No. 52. The court held a hearing on the matter on April 3, 2014. 4/3/2014 Minute Order, ECF No. 69. Upon consideration of the applicable legal authority, evidence submitted, and arguments of the parties in their papers and at the hearing, the court **GRANTS** GNC's motion with respect to all of Mr. Brewer's claims.

## STATEMENT

### I.  THE PARTIES

Defendant GNC is a nationwide retailer of nutritional supplements and vitamins.  Reidy

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

Declaration, ECF No. 57 ¶ 3.  On January 29, 2010, Mr. Brewer, a black male who at that time was 57 years old, applied for a job at GNC.   Joint Statement of Undisputed Facts ("JSUF"), ECF No. 51 ¶¶ 1, 4.  He was interviewed by Carol Owens, the then-manager of GNC's store in Mountain View, California (the "Mountain View Store"), and she hired him to work there as a part-time sales associate.  JSUF ¶¶ 2-3.  He began work for GNC on February 22, 2010.  JSUF ¶ 2.  Later, he became a full-time assistant manager.  JSUF ¶ 8.  At all relevant times, he was an at-will employee. Reidy Declaration ¶ 4, Ex. C.

## II. GNC'S RELEVANT EMPLOYEE POLICIES

GNC has written policies against harassment and discrimination that are distributed to employees at the commencement of their employment.  Reidy Declaration ¶ 8.  Its Employee Handbook, which Mr. Brewer received, contains written policies prohibiting discrimination and harassment.  Reidy Decl. ¶ 8, Exs. E & F.  GNC's "Prohibition Against Harassment" policy clearly identifies harassment and discrimination based on race, disability, age, etc. as being illegal and against company policy.  Employees who are subjected to, or even aware of, discrimination or harassing conduct, are instructed to report the conduct to the Employee Relations Department of the Corporate Human Resources Department at 1-800-678-0867.  *Id.*  This "hotline" number is posted at every GNC store.  GNC's retail stores also have Retail Operations Manuals (both in a hard copy and available on the store's electronic portal) which include specific policies prohibiting discrimination and harassment and include a Code of Conduct that applies to all employees.  *Id.* ¶ 9, Ex. G.

GNC, as a national retailer, also has uniform policies and procedures related to most aspects of the employment relationship, including store operations.  In relevant part, the Employee Handbook includes requirements that sales associates' time always must be recorded exactly as it has occurred. Work schedules are determined by management and must be flexible to ensure adequate store coverage at all times.  *Id.* ¶ 10, Ex. E.  In addition, the Retail Operations Manual contains specific provision as to Staffing and Wages and states that deliberate falsification of time is cause for disciplinary action.  *Id.*

All GNC associates have the ability to purchase GNC product at a discount.  *Id.* ¶ 11, Ex. I.  All employee purchases, however, must be rung through a register, and all products purchased for

consumption must be rung before consumption. *Id.* As set forth in Section 40 of the Disciplinary Guidelines of the Retail Operations Manual, failure to pay for a product prior to consumption is grounds for immediate dismissal. *Id.*, Ex. J.

### III. MR. BREWER'S POSITIONS, WORK LOCATIONS, AND MANAGERS

Mr. Brewer was employed by GNC for approximately 16 months. He began work as a part-time associate at the Mountain View Store on February 22, 2010. JSUF ¶¶ 2, 5. While there, he was managed by Ms. Owens. JSUF ¶ 3. In December 2010, Mr. Brewer was transferred to GNC's store in Palo Alto, California (the "Palo Alto Store"). JSUF ¶ 5. At the Palo Alto Store, Mr. Brewer was managed by Brian Lebreton. JSUF ¶ 6. On May 1, 2011, Mr. Brewer was promoted to the position of full-time assistant manager and both Mr. Brewer and Mr. Lebreton were transferred to GNC's store located at the Hillsdale Mall in San Mateo, California (the "Hillsdale Store"). JSUF ¶ 8. Mr. Brewer's employment was terminated a few weeks later on May 19, 2011. JSUF ¶ 16. Before the events surrounding his termination (discussed below), Mr. Brewer had no previous employment disciplinary actions taken against him. Brewer Declaration, ECF No. 63-5 ¶ 4.

### IV. MR. BREWER'S COMPLAINTS ABOUT RACIALLY DEROGATORY COMMENTS

Mr. Brewer asserts that from the day he started at the Mountain View Store, Ms. Owens made several derogatory comments about certain races. He says that on the day he was hired, Ms. Owens told him that "she was never about black people" and that she did not have any black friends. Pradmore Declaration, ECF No. 63-1, Ex. 3 ("Brewer Depo.") at 45:23-24. He also says that Ms. Owens told him on at least ten occasions that black and Hispanic individuals buy certain GNC products to cleanse their urine to pass drug-screening tests and two or three times that black and Hispanic individuals purchase a product called Inositol to mix it with cocaine before they sell it. *Id.* at 40:22 - 42:15, 47:10 - 48:1, 89:21-25. Once, when a white man purchased Inositol, Mr. Brewer asked Ms. Owens, "What do you think he is using it for?" *Id.* at 41:11-16. She did not respond; she did not express a belief that white people buy Inositol to use to mix with cocaine. *Id.* In addition, Mr. Brewer says that on two or three occasions Ms. Owens told him that black men are "big and stocky"; he thinks that she meant this to imply that black men are intimidating. *Id.* at 43:1 - 44:24. He also says that on one occasion when a bucket of protein power was missing, Ms. Owens said that

1   either the "Hispanic guy" or "the black guy" took it, even though she did not see them take it.  *Id.* at

2   49:4 - 51:25, 90:16 - 91:18.  He further says that Ms. Owens told him that she doesn't bother asking

3   black or Hispanic customers for their email addresses because "black people don't use email" and

4   Hispanic individuals do not have email addresses because they are here illegally.  *Id.* at 52:8-18,

5   89:4-18.

6        Mr. Brewer says that he told Ms. Owens on several occasions that her comments were racist,

7   offensive, and unlawful.  *Id.* at 41:15-42:15, 43:5-24, 48:9-17.  On September 22, 2010, Regional

8   Sales Director Michelle Murray visited the Mountain View Store and said to Mr. Brewer, "I heard

9   that you were going to sue."  *Id.* at 43:13-24.  Mr. Brewer explained to Ms. Murray that he never

10  told Ms. Owens that he was going to sue; instead, he told Ms. Owens that her numerous racial slurs

11  were offensive.  Brewer Declaration, ECF No. 63-4 ¶ 6.  There is no indication in the record that

12  GNC ever investigated any of Mr. Brewer's complaints about Mr. Owens's comments.

13  **V.  MR. BREWER'S COMPLAINTS ABOUT GNC'S WAGE-AND-HOUR VIOLATIONS**

14       Mr. Brewer says that he complained to Ms. Owens, Mr. Lebreton, and Ms. Murray about wage-

15  and-hour violations he suffered.  Brewer Depo. at 65:17 - 69:25, 78:1 - 79:20.  He does not specify

16  when he made these complaints.  Specifically, Mr. Brewer says that he complained about being

17  required to work off-the-clock when he had to take deposits from the store to the bank after his shift

18  had ended and about not being reimbursed for mileage.  *Id.* at 65:17 - 79:20.  He says that he even

19  sent a letter to Ms. Murray expressing his concerns in this regard.  *Id.* at 66:12-19.  This letter,

20  however, is not in the record.  He says that in response these individuals told him that this is the way

21  it had always been done.  *Id.* at 79:3-15.

22  **VI.  MR. BREWER'S TERMINATION**

23       On May 11, 2011, Crystal Fenech, apparently a GNC manager of one of the stores that Mr.

24  Brewer worked at[2], contacted Shannen Stennerson, GNC's regional loss prevention investigator, and

25  _____

26       [2] It is not clear who Ms. Fenech is.  In its motion, GNC states that Ms. Fenech was "the
    manager who had worked at the store which was being managed by Lebreton/Brewer."  Motion,
27  ECF No. 2 at 11.  According to the evidence submitted, Mr. Brewer did not become an assistant
    manager until May 1, 2011, when he was transferred to the Hillsdale Store.  GNC also states that
28  "two of Ms. Fenech's former employees (now working for Lebreton/Brewer)" complained to GNC's

told her that Kyrolos Elgendy and Boris Abarca, two employees working at the Hillsdale Store, claimed that Mr. Lebreton and Mr. Brewer violated GNC's policies. JSUF ¶ 9.1[3]; *see also* Stennerson Decl., ECF No. 56 ¶ 6, Ex. A (Ms. Stennerson's investigation file). Ms. Stennerson began an investigation. Stennerson Decl. ¶ 7. She first spoke with Mr. Elgendy. He told her that he saw Mr. Lebreton change Mr. Brewer's hours to reflect that Mr. Brewer has been at the Hillsdale Store and working when actually Mr. Brewer was not there. *Id.* Mr. Elgendy also said that he had been working in the store on May 8, 2011 and that Mr. Brewer, who also scheduled to work that day, arrived at 1:30 p.m. and changed his time to reflect an arrival time of 11:30 a.m. *Id.* Ms. Stennerson also spoke with Boris Abcara. He told her that on May 11, 2011, Mr. Brewer had offered to clock him in earlier then he was able to arrive and asked Mr. Abcara if he would clock Mr. Brewer out a half hour after Brewer was going to leave. *Id.* ¶ 8. Mr. Abcara also told Ms. Stennerson that Mr. Brewer had taken both a returned, non-saleable product and a trial size bottle of Oxy-elite. *Id.* Mr. Abcara also provided a written statement to Ms. Stennerson memorializing his statements. *Id.*, Ex. B.

On May 12, 2011, Ms. Stennerson spoke with Mr. Lebreton. He admitted to violating GNC's policy about keeping accurate time records. *Id.* ¶ 9, Ex. C. After this conversation, Mr. Lebreton was put on suspension pending further investigation. JSUF ¶ 10. Sometime thereafter[4], he was terminated. JSUF ¶ 11.

On May 13, 2011, Ms. Stennerson spoke with Mr. Brewer. JSUF ¶ 12. This conversation was held in the presence of a senior store manager Elizabeth Naranjo. *Id.* During the conversation, Mr. Brewer claimed that he had clocked in and out only to take breaks that he had not taken because he

---

loss prevention department about Mr. Brewer's and Mr. Lebreton's conduct. Together, these statements suggest that Ms. Fenech managed the Hillsdale Store before Mr. Lebreton and Mr. Brewer were transferred to it and that Ms. Fenech no longer worked at the Hillsdale Store once Mr. Lebreton and Mr. Brewer started working there. GNC does not make this explicit, though.

[3] The parties' joint statement of undisputed facts contains two paragraphs numbered as "Paragraph 9." *See* JSUF, ECF No. 51 at 2-3. To cite to these two paragraphs, then, the court will refer to the first one as Paragraph 9.1 and the second one as Paragraph 9.2.

[4] The parties did not state that date on which Mr. Lebreton was terminated.

thought he was helping the company by recording the actual time he worked. Stennerson Declaration ¶ 10. He also claimed that he was permitted to take the Oxy-elite because a sales promotion related to the product was over. *Id.* He denied taking any other product. JSUF, Ex. H; *see also* Brewer Depo. at 34:25 - 35:5. Ms. Stennerson stated that Mr. Brewer became loud during this conversation, but Mr. Brewer denies this. JSUF, Ex. H; Brewer Depo. at 34:20-21. Later, Mr. Brewer wrote a statement summarizing the information he provided during the interview, and it included in the loss prevention report. JSUF ¶ 13, Ex. H; Stennerson Declaration ¶ 11; Brewer Depo. at 35:15-20. Ms. Naranjo also prepared a statement summarizing the interview. JSUF ¶ 14, Ex. H. After this conversation, Mr. Brewer was put on suspension pending further investigation. JSUF ¶ 15.

After her conversation with Mr. Brewer, Ms. Stennerson determined that the Oxy-elite product that Mr. Brewer took was a promotional "gift with purchase" item valued at $7.99 which would be "zeroed out" on the register if purchased with another item. Stennerson Declaration ¶ 12. Thus, by taking that item, Mr. Brewer had taken an item valued at $7.99 and did not run it through the register, in violation of GNC's policy. *Id.* As Mr. Brewer denied taking the returned, non-saleable product, Ms. Stennerson made no determination about this claim. *Id.* Ms. Stennerson also reviewed Mr. Brewer's time records and determined that on May 1, 2011 he had clocked in at 1:00 p.m. but his time was adjusted to reflect a clock-in time of 11:30 a.m. *Id.*

After conducting her investigation, Ms. Stennerson concluded that Mr. Brewer had impermissibly taken a product without paying for it and had clocked an hour and a half of time that he did not work. *Id.* These conclusions are reflected in the Loss Prevention Report she prepared. *Id.*, Ex. A. She reported the conclusions to Human Resources. *Id.*

Sometime after his May 13, 2011 conversation with Ms. Stennerson, Mr. Brewer prepared a statement, addressed to Bill Roller, an inventory manager for GNC, regarding the investigation. Kuniak Declaration, ECF No. 55, Ex. A; Brewer Depo at 36:21 - 37:8. In it, Mr. Brewer says Ms. Stennerson's attitude was unpleasant and that her investigation was biased, subjective, and coercive. *See* Kuniak Declaration, Ex. A. He also reiterates his argument that the changes to his hours were correct, as many of them were to reflect lunches and breaks that were not taken earlier in the day.

*See id.* He also mentioned his complaints about having to work off-the-clock and not being reimbursed for expenses. *See id.* He did not mention any of his complaints about race or age discrimination. *See id.*

On May 18, 2011, it appears he tried to email the statement to Marianne Wagner, an employee in GNC's Human Resources department, but he sent his email to marion-wagner@gnc-hq.com, which is not her email address, rather than to marianne-wagner@gnc-hq.com, which is. *Id.*, Ex. A. He copied Ms. Murray and James Inlow, another employee in GNC's Human Resources department. *Id.*, Ex. A. His email also states that he mailed copies of the statement to her for delivery to Tony Kuniak, GNC's Director of Loss Prevention, Lorri Murphy, GNC's Corporate Loss Prevention Manager, and Mr. Roller. *Id.*, Ex. A. Mr. Roller received the statement, but he forwarded it to Ms. Stennerson's supervisor because he (Mr. Roller) did not supervise her and would not have been involved with a loss prevention investigation that did not involve store inventory or conversion. Roller Declaration, ECF No. 54 ¶ 3. Mr. Kuniak does not recall receiving it, and he also states that Lorri Murphy could not have received because she had not been employed by GNC since July 31, 2009. Kuniak Declaration ¶¶ 2, 4.

As a result of the investigation, and based upon Ms. Stennerson's conclusion that Mr. Brewer impermissibly took product, as well as an hour and a half of time, Mr. Brewer was terminated on May 19, 2011 for "violation of company policy." JSUF ¶ 16; Reidy Declaration ¶ 12, Ex. K (Employee Separation Report). The decision to terminate Brewer was communicated to him by Ms. Murray. JSUF ¶ 17. There does not appear to be any evidence in the record, however, that Ms. Murray had anything to do with the making of that decision. In fact, there does not even appear to be any evidence in the record about who decided to terminate him.

At no time during his conversation with Ms. Stennerson (and Ms. Naranjo) did Mr. Brewer tell Ms. Stennerson that he had made complaints about not getting reimbursed for making bank deposits or for gas expenses, or that he had complained about, or been subject to, racial discrimination. Stennerson Declaration ¶ 11. Mr. Lebreton also did not tell Ms. Stennerson that Mr. Brewer ever complained that he had not been reimbursed for business expenses or otherwise had not been paid for wages which were owed, or had otherwise been racially harassed. *Id.* ¶ 14. Ms. Stennerson

1  did not speak to Ms. Murray during the course of her investigation, and in fact she never spoke to

2  Ms. Murray about Mr. Brewer in any respect either before or after her investigation. *Id.* Ms.

3  Stennerson also did not speak with Mr. Inlow about Mr. Brewer other than to tell him the results of

4  the loss prevention investigation. *Id.*

5  **VII.  MR. BREWER'S ADMINISTRATIVE COMPLAINTS**

6      On June 3, 2011, a few weeks after he was terminated, Mr. Brewer filled out a "Pre-Complaint

7  Questionnaire - Employment" for California's Department of Fair Employment and Housing

8  ("DFEH"). Germaise Declaration, Ex. H ("DFEH Records"), ECF No. 53-2 at 27-28. In that

9  questionnaire, Mr. Brewer expressed his wish to complain against GNC and Ms. Stennerson based

10  on his belief that he was discriminated against because of his race, sex, and age. *Id.* at 27. Mr.

11  Brewer marked from a list that the discriminatory treatment was his suspension and termination. *Id.*

12  Significantly, he did not mark that the discriminatory treatment was harassment (even though that

13  was one of the choices). *Id.* It appears he was interviewed about his claims---race, sex, and age

14  discrimination---by someone at DFEH a few days later. *Id.* at 29-33, 41. The next month, on July

15  27, 2011, a DFEH employee mailed Mr. Brewer an unsigned copy of his formal complaint. *Id.* at

16  38-39. Mr. Brewer signed it on August 4, 2011 and returned it, and it was assigned as DFEH #

17  E201112M0181-00-ase. *Id.* at 17. It also was filed with the federal Equal Employment Opportunity

18  Commission and assigned as EEOC # 37AB108708. *Id.* This complaint listed sex and age as the

19  basis for discrimination but did not list race as a basis. *Id.* In the complaint, Mr. Brewer alleged that

20  he had been differentially treated "[f]rom May 13, 2011 to present," and that a younger female

21  coworker had also made changes to her time cards but was not suspended. *Id.* Notice of this

22  complaint being filed was provided by DFEH to GNC by letter dated August 10, 2011. *Id.* at 23-24.

23  On September 9, 2011, DFEH informed Mr. Brewer that based upon its investigation, it was unable

24  to conclude that a violation occurs. *Id.* at 18. Accordingly, DFEH closed the case. *Id.* DFEH's

25  letter served as Mr. Brewer's right-to-sue notice. *Id.*

26      Mr. Brewer filed a second complaint with DFEH. Among the DFEH records submitted, there is

27  a complaint by Mr. Brewer against GNC for race discrimination and retaliation that is dated

28  November 1, 2011. *Id.* at 9. Although it contains no substantive allegations, Mr. Brewer did mark

1    from a list that his complaint is based on his termination and retaliation.  *Id.*  Significantly, he did

2    not mark that his complaint is based on harassment or failure to prevent to discrimination.  *Id.*  It

3    was assigned as DFEH # E201112M5478-00.  *Id.*  This complaint was never served on GNC,

4    however, and instead DFEH closed the case that same day (November 1, 2011) and issued Mr.

5    Brewer a right-to-sue notice.  *Id.* at 10-12.

6    **VIII.  THIS ACTION'S PROCEDURAL HISTORY**

7        Mr. Brewer filed his complaint on May 10, 2012---less than one year after he was investigated

8    and terminated by GNC.  Complaint, ECF No. 1.  He brings the following seven claims: (1)

9    retaliation in violation of California Labor Code §§ 98.6, 98.7, and 230; (2) retaliation in violation of

10   California public policy; (3) wrongful termination in violation of California public policy; (4) race

11   discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't

12   Code § 12940 *et seq.*; (5) race discrimination in violation of California public policy; (6) failure to

13   prevent race discrimination in violation of FEHA; and (7) age discrimination in violation of FEHA.

14   *See id.*  GNC answered the complaint on July 10, 2012, Answer, ECF No. 3, and the parties

15   conducted full discovery.  All parties have consented to the undersigned's jurisdiction.  Consent

16   (Mr. Brewer), ECF No. 6; Consent (GNC), ECF No. 7.

17       On February 27, 2014, GNC filed a motion for summary judgment.  Motion, ECF No. 52.[5]  Mr.

18   Brewer filed an opposition on March 13, 2013.  Opposition, ECF No. 63.  GNC filed a reply and

19

20

---

21       [5] GNC also filed a request asking the court to take judicial notice of Mr. Brewer's complaint
     in this action.  Request for Judicial Notice, ECF No. 58-1.  Because the complaint is already filed in
22   the docket for this action, it is unnecessary for the court to take judicial notice of it.  *See Johnson v.
     Haight Ashbury Med. Clinics, Inc.*, No. C–11–02052–YGR, 2012 WL 629312, at *1 (N.D. Cal. Feb.
23   27, 2012) (denying a request for judicial notice "because it is unnecessary to take judicial notice of
     documents in the record in this action"); *Martinez v. Blanas*, No. 2:06–cv–0088 FCD DAD (PC),
24   2011 WL 864956, at *1 n.1 (E.D. Cal. Mar. 10, 2011) ("Defendant's request for judicial notice of
     the second amended complaint will be denied as unnecessary.  The second amended complaint and
25   its exhibits are a part of the record in this action."); *Patoc v. Lexington Ins. Co.*, No. 08-01893 RMW
     (PVT), 2008 WL 3244079, at *1 n.3 (N.D. Cal. Aug. 5, 2008) ("Because this complaint is already
26   before the Court as an exhibit to the Notice of Removal, the Court does not need to take judicial
     notice of this complaint."); *see also Jackson v. Med. Bd. of Cal.*, 424 Fed. Appx. 670, 670 (9th Cir.
27   Mar. 25, 2011).  GNC's request therefore is denied.
28

objections to some of Mr. Brewer's evidence on March 20, 2014.[6]  Reply, ECF No. 64; Objections

to Brewer Declaration, ECF No. 64-2; Objections to Bruns Declaration, ECF No. 64-3; Objections

to Neal Declaration, ECF No. 64-4; Objections to Pradmore Declaration, ECF No. 64-5.  Finally, on

April 2, 2014, Mr. Brewer filed an additional declaration in support of his opposition, and GNC filed

a motion to strike that declaration the same day.  Truong Declaration, ECF No. 67; Motion to Strike,

ECF No. 68.[7]  The court held a hearing on the matter on April 3, 2014.  4/3/2014 Minute Order, ECF

No. 69.

## ANALYSIS

### I.  LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosures on file, and

affidavits show that there is no genuine issue as to any material fact and the moving party is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).  Material facts are those that may affect the outcome of the case.  *See id.* at 248.

A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to

return a verdict for the non-moving party.  *See id.* at 248-49.

The party moving for summary judgment has the initial burden of identifying those portions of

the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a

genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In

considering a motion for summary judgment, the court may not weight the evidence or make

credibility determinations, and is required to draw all inferences in a light most favorable to the non-

moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

When the nonmoving party has the burden of proof at trial, the moving party need point out only

"that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the

---

[6] As seen below, because Mr. Brewer's claims all fail for reasons independent of his arguments and the evidence that GNC objects to, the court need not rule on GNC's evidentiary objections.  They are moot.

[7] Again, as seen below, because Mr. Brewer's claims all fail for reasons independent of his arguments and the Truong Declaration, the court denies GNC's motion to strike as moot.

moving party meets this initial burden, the non-moving party must go beyond the pleadings and – by its own affidavits or discovery – set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, summary judgment is proper against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See id.* at 323. The mere existence of a "scintilla" of evidence in support of the non-moving party's position is not sufficient. The non-moving party has the burden of establishing sufficient evidence on each element of his case so that the finder of fact could return a verdict for him. *Anderson*, 477 U.S. at 249. To meet this burden, the nonmoving party must come forward with admissible evidence. Fed. R. Civ. P.56(e).

## II. MR. BREWER'S DISCRIMINATION CLAIMS

### A. The *McDonnell Douglas* Burden-Shifting Test

In federal and state employment actions alleging discrimination based on a disparate treatment theory, summary judgment motions are analyzed under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Chuang v. University of California Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (citing *McDonnell Douglas*); *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (applying *McDonnell Douglas* to FEHA claims); *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354 (2000) (same). This standard has been applied to claims of discrimination based on age, *see Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 704 (9th Cir. 1993), and race, *see Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006). First, the plaintiff has the initial burden under the statute of establishing a prima facie case for discrimination. Second, if the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment decision. Third, if the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a "pretext" for discrimination. *McDonnell*, 411 U.S. at 802–04.

1

### B. Mr. Brewer's Age Discrimination Claim

Mr. Brewer brings a claim for age discrimination in violation of FEHA. To state a prima facie case of age discrimination, Mr. Hamilton must show that he (1) is a member of a protected class (here, that he was at least 40 years old ); (2) was performing his job satisfactorily; (3) was discharged; and (4) either was replaced by a substantially younger employee with equal or lesser qualifications or was discharged under circumstances giving rise to an inference of discrimination. *See Nesbit*, 994 F.2d at 704. The proof necessary for a plaintiff to establish a prima facie case is "minimal" and need not even rise to the level of a preponderance of the evidence. *See Avila v. Continental Airlines*, 165 Cal. App. 4th, 1237, 1246 (2008) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

GNC argues that Mr. Brewer has not shown that he was performing his job satisfactorily (the second element) or that he either was replaced by a substantially younger employee with equal or lesser qualifications or was discharged under circumstances giving rise to an inference of discrimination (the fourth element). *See* Motion, ECF No. 52 at 24-25. And in its reply, GNC points out that Mr. Brewer fails to address GNC's arguments in this regard. *See* Reply, ECF No. 64 at 7. This is true: in his opposition, of his FEHA discrimination claims, Mr. Brewer addresses only the ones related to race discrimination. *See* Opposition, ECF No. 63 at 17-19. Moreover, the court has neither seen nor been pointed to any evidence in the record about who replaced Mr. Brewer after he was terminated, let alone any evidence about the age of his replacement. In short, Mr. Brewer has failed to make a prima facie showing of an age discrimination claim, and he does not attempt to argue otherwise. Accordingly, the court **GRANTS** GNC's motion for summary judgment with respect to Mr. Brewer's claim for age discrimination.

### C. Mr. Brewer's Race Discrimination Claims

Mr. Brewer also brings race discrimination in violation of FEHA and California public policy and for failure to prevent discrimination in violation of FEHA. Mr. Brewer's claims appear to based upon two theories: first, that he was terminated because of racial animus, and second, that he was subjected to a hostile work environment. *See* Complaint, ECF No. 1 ¶¶ 38-40, 46-47; *see also* Opposition, ECF No. 63 at 5 (mentioning a hostile work environment as well as his termination).

Although Mr. Brewer combined these two theories in his claims (rather than alleging them as separate claims), the court discusses each theory below.

### 1. Mr. Brewer's Discriminatory Termination Claim

As an initial matter, GNC argues that Mr. Brewer did not exhaust his administrative remedies with respect to his FEHA claims. It is true that Mr. Brewer must have done so. As the Ninth Circuit has explained:

> "In order to bring a civil action under FEHA, the aggrieved person must exhaust the administrative remedies provided by law." *Yurick v. Superior Court*, 209 Cal. App. 3d 1116, 1121, 257 Cal. Rptr. 665 (1989); *accord Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 492, 59 Cal. Rptr. 2d 20, 926 P.2d 1114 (1996). Exhaustion in this context requires filing a written charge with DFEH within one year of the alleged unlawful employment discrimination, and obtaining notice from DFEH of the right to sue. *Romano*, 14 Cal. 4th at 492, 59 Cal. Rptr. 2d 20, 926 P.2d 1114; *Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1613, 43 Cal. Rptr. 2d 57 (1995); *Martin v. Lockheed Missiles & Space Co.*, 29 Cal. App. 4th 1718, 1724, 35 Cal. Rptr. 2d 181 (1994). The scope of the written administrative charge defines the permissible scope of the subsequent civil action. *Yurick*, 209 Cal. App. 3d at 1121–23, 257 Cal. Rptr. 665. Allegations in the civil complaint that fall outside of the scope of the administrative charge are barred for failure to exhaust. These procedural requirements, as with all provisions of FEHA, are to "be construed liberally for the accomplishment of the purposes [of FEHA]." Cal. Gov't Code § 12993(a). Those purposes include the elimination of employment discrimination. § 12920.

*Rodriguez v. Airborne Express*, 265 F.3d 890, 896-97 (9th Cir. 2001) (footnote omitted).

Here, GNC argues that Mr. Brewer "did not identify an racially inappropriate comments by Carol Owens in any timely administrative charge." Motion, ECF No. 52 at 19. "Instead," GNC goes on, "Mr. Brewer claimed that Shannen Stennerson had discriminated against him on his age and sex (a claim which is not even asserted in the Complaint) because a younger African American employee had made changes to her time car and had not been suspended." *Id.* Mr. Brewer responds by simply pointing out that he filed, within one year of his termination, two complaints with DFEH—one on August 4, 2011 and one of November 1, 2011---and received right-to-sue notices for both of them. *See* Opposition, ECF No. 63 at 14. He also points out that his second complaint---the one filed on November 1, 2011---alleged that GNC discriminated against him on the basis of race. *Id.*

The court finds that Mr. Brewer has demonstrated that he exhausted his administrative remedies with respect to his termination. As the court recounted above, in his complaint Mr. Brewer filled out

a "Pre-Complaint Questionnaire - Employment" in which he expressed his wish to complain against GNC and Ms. Stennerson based on his belief that he was discriminated against because of his race, sex, and age, he marked from a list that the discriminatory treatment was his suspension and termination, and he was interviewed about those claims. For some reason, his complaint omitted race as a basis for discrimination. In any case, Mr. Brewer's second complaint included a claim for race discrimination, and although it contains no substantive allegations, Mr. Brewer did mark from a list that his complaint is based on his termination and retaliation. In its reply, GNC suggests that this is not good enough "as to the claimed racially inappropriate statements of Carol Owens because he did not identify a single such statement" in those complaints, *see* Reply, ECF No. 4 at 14, but that is an argument directed at Mr. Brewer's hostile work environment claim, not his termination claim. Mr. Brewer clearly raised race discrimination in his initial DFEH interview and actually included it in his second DFEH complaint, and he clearly stated that the discriminatory event was his termination. To the extent that his race discrimination claims are based upon his termination, they are "within the scope of the administrative investigation 'which can reasonably be expected to grow out of the charge of discrimination.'" *Rodriguez*, 265 F.3d at 896 (citing *Sandhu v. Lockheed Missiles & Space Co.*, 26 Cal. App. 4th 846, 858-59 (Cal. Ct. App. 1994) (adopting this "like or reasonably related" standard)). Accordingly, the court finds that Mr. Brewer exhausted his administrative remedies with respect to his race discrimination claims insofar as they are based on his termination.

Thus, the court moves on to consider the merits of Mr. Brewer's claims. To state a prima facie case of race discrimination, Mr. Brewer must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See, e.g.*, *McDonnell Douglas*, 411 U.S. at 802; *Fonseca v. Sysco Food Services of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004).

Mr. Brewer contends that the McDonnell Douglas burden-shifting test does not apply to his FEHA race discrimination claims because he has presented direct evidence of discrimination. *See*

Opposition, ECF No. 63 at 17-18.  Indeed, California courts do distinguish between FEHA

discrimination actions where a plaintiff presents direct evidence of discrimination and those where a

plaintiff presents indirect evidence.  As one court has explained:

> In employment discrimination cases under FEHA, plaintiffs can prove their cases
> in either of two ways: by direct or circumstantial evidence.  (*Guz*, *supra*, 24 Cal. 4th
> at p. 354, 100 Cal. Rptr.2d 352, 8 P.3d 1089.)  When a plaintiff proffers
> circumstantial evidence, California courts apply the three-stage burden-shifting test
> established by the United States Supreme Court for trying claims of employment
> discrimination . . . based on a theory of disparate treatment.  (*Ibid.*, citing *McDonnell
> Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668
> (*McDonnell Douglas*).)
>
> However, California has also adopted the rule that "'the *McDonnell Douglas* test
> is inapplicable where the plaintiff presents direct evidence of discrimination.'. . .."
> (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144, 29
> Cal. Rptr. 3d 144 (Trop ), quoting *Trans World Airlines, Inc. v. Thurston* (1985) 469
> U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (*Trans World*).)  The *Trans World*
> court reasoned that "[t]he shifting burdens of proof set forth in *McDonnell Douglas*
> are designed to assure that the 'plaintiff [has] his day in court despite the
> unavailability of direct evidence.' [Citation.]"  (*Trans World*, supra, 469 U.S. at p.
> 121, 105 S.Ct. 613, italics added.)  Thus, there is no need to engage in this
> burden-shifting analysis where there is direct evidence of discriminatory animus.
> (*Trop*, *supra*, 129 Cal. App. 4th at pp. 1144–1145, 29 Cal. Rptr. 3d 144.)
>
> Direct evidence is evidence which, if believed, proves the fact of discriminatory
> animus without inference or presumption.  Comments demonstrating discriminatory
> animus may be found to be direct evidence if there is evidence of a causal
> relationship between the comments and the adverse job action at issue.  (*Trop*, supra,
> 129 Cal. App. 4th at pp. 1146–1149, 29 Cal. Rptr. 3d 144.)

*DeJung v. Superior Court*, 169 Cal. App. 4th 533, 549-50 (Cal. Ct. App. 2008) (footnote omitted).

Here, Mr. Brewer argues only that Ms. Owens's numerous comments (recounted above) are

"direct evidence of [Ms.] Owens'[s] racial animus against African Americans."  *Id.* at 17-18.  But as

GNC points out in both in its motion and reply, Mr. Brewer has not shown that Ms. Owens had

anything to do with Ms. Stennerson's investigation or his termination.  *See* Motion, ECF No. 52 at

23; Reply, ECF No. 64 at 17.  And, to the extent that Ms. Murray knew about his complaints about

Ms. Owens, he has not shown that Ms. Murray had anything to do with Ms. Stennerson's

investigation or his termination (aside from simply informing of the fact of it).  Indeed, as the court

mentioned earlier, Mr. Brewer has not even shown who at GNC actually made the decision to

terminate him.  GNC, on the other hand, produced evidence that neither Mr. Brewer nor Mr.

Lebreton said anything to Ms. Stennerson about Ms. Owens's comments, and that Ms. Stennerson

1    did not speak to Ms. Murray during the course of her investigation, and in fact she never spoke to

2    Ms. Murray about Mr. Brewer in any respect either before or after her investigation. Moreover, Mr.

3    Brewer did not mention Ms. Owens's comments in his statement addressed to Bill Roller and which

4    he tried to send to numerous GNC employees.

5        In sum, Mr. Brewer claims that his termination was due to racial animus demonstrated by Ms.

6    Owens, but he fails to show that Ms. Owens had anything to do with his termination or that anyone

7    who might have had anything to do with his termination knew about these comments or his

8    complaints about them. Without evidence of these things, the court finds that Mr. Brewer has not

9    met his burden to show a prima facie case of race discrimination. Accordingly, the court **GRANTS**

10   GNC's motion for summary judgment with respect to Mr. Brewer's claim for race discrimination in

11   relation to his termination.

12           **2. Mr. Brewer's Hostile Work Environment Claim**

13       GNC again contends that Mr. Brewer did not exhaust his administrative remedies, but this time

14   the court agrees. As the court described above, while Mr. Brewer filed two DFEH complaints,

15   neither of them relates to the comments Ms. Owens made when he worked for her from February

16   2010 through December 2010. For his first complaint, Mr. Brewer filled out a "Pre-Complaint

17   Questionnaire - Employment" and stated that he was discriminated against because of his race, sex,

18   and age, but he marked from a list that the discriminatory treatment was his suspension and

19   termination and did not mark that the discriminatory treatment was harassment (even though that

20   was one of the choices). And in the complaint that resulted from that questionnaire, he alleged that

21   he had been differentially treated "[f]rom May 13, 2011 to present," which does not encompass any

22   of the time he worked for Ms. Owens. For his second complaint, Mr. Brewer stated that he was

23   subjected to race discrimination and retaliation, and he marked from a list that his complaint was

24   based on his termination and retaliation. Significantly, he did not mark that his complaint is based

25   on harassment or failure to prevent to discrimination. Moreover, in neither of his complaints does he

26   ever mention anything about Ms. Owens's comments or any other conduct that created a hostile

27   work environment. Mr. Brewer's general citation in his opposition to his two complaints does not

28   overcome these deficiencies. Accordingly, the court finds that Mr. Brewer did not exhaust his

1   administrative remedies with respect to his FEHA hostile work environment claim.

2   Even if he had, and even after considering the evidence in the light most favorable to him, the

3   court finds that Ms. Owens's comments were not sufficiently severe or pervasive to create a hostile

4   work environment under the applicable law.[8]  FEHA makes harassment illegal and requires an

5   employer to take immediate and appropriate action against it.  Cal. Gov't Code § 12940(j)(1).

6   California courts apply federal decisions interpreting Title VII to analyze FEHA racial harassment

7   claims.  *Etter v. Veriflo*, 67 Cal. App. 4th 457, 464 (Cal. Ct. App. 1998).  A plaintiff may prove

8   racial harassment by demonstrating that an employer has created a hostile or abusive work

9   environment.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65-67 (1986).  To prevail on a hostile

10  workplace claim premised on race, a plaintiff must show: (1) that he or she was subjected to verbal

11  or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct

12  was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create

13  an abusive work environment.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir.

14  2003); *Fisher v. San Pedro Peninsula Hospital*, 214 Cal. App. 3d 590, 608 (Cal. Ct. App. 1989)

15  (adopting same standard for harassment claims under FEHA).  A plaintiff must show that the work

16  environment was abusive from both a subjective and an objective point of view.  *Fuller v. City of*

17  *Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995).  Whether the workplace is objectively hostile must be

18  determined from the perspective of a reasonable person with the same fundamental characteristics as

19  the plaintiff.  *Id.*  In determining whether a work environment is hostile or abusive, the court must

20  consider all of the circumstances.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). This may

21  include "the frequency of the discriminatory conduct; its severity; whether it is physically

22  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

23  with an employee's work performance."  *Id.*  Although the "mere utterance of an . . . epithet which

24

25

26  [8] A court may grant summary judgment on a FEHA harassment/hostile work environment
    claim on the basis that no reasonable jury could find the defendant's conduct severe of pervasive.
27  *See*, *e.g.*, *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000) (affirming summary
    judgment in favor of employer on this basis); *Yoshimoto v. O'Reilly Auto., Inc.*, Nos. C 10-5438
28  PJH, C 11-3119 PJH, 2013 WL 6446249 (N.D. Cal. Dec. 9, 2013) (granting summary judgment in
    favor of employer on this basis).

engenders offensive feelings in an employee" does not alter the employee's terms and conditions of employment sufficiently to create a hostile work environment, "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'" such an environment exists. *Meritor*, 477 U.S. at 65, 67. Neither "simple teasing," "offhand comments," nor "isolated incidents" alone constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Further, "even if a hostile working environment exists, an employer is only liable for failing to remedy harassment of which it knows or should know." *Fuller*, 47 F.3d at 1527.

GNC argues in its motion and reply that Mr. Brewer has not shown that Ms. Owens's comments were sufficiently severe or pervasive to support a claim for racial harassment. *See* Motion, ECF No. 52 at 19-22; Reply, ECF No. 64 at 15-16. To briefly recount, Mr. Brewer says that Ms. Owens, over the course of the 10 months that he worked for her, told him that "she was never about black people"; she did not have any black friends; black and Hispanic individuals (as opposed to white individuals) buy certain GNC products to cleanse their urine to pass drug-screening tests and purchase a product called Inositol to mix it with cocaine before they sell it; black men are "big and stocky"; and "black people don't use email" and Hispanic individuals do not have email addresses because they are in the United States illegally. And, when a bucket of protein power was missing, Ms. Owens said that either the "Hispanic guy" or "the black guy" took it, even though she did not see them take it.

As one court in this district has described, "[s]uccessful claims of hostile work environment include harsh and, generally, repetitive verbal abuse." *Lockett v. Bayer Healthcare*, No. C 05-03978 CRB, 2008 WL 624847, at *9 (N.D. Cal. Mar. 3, 2008) (citing *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002) (finding that a Korean plaintiff suffered national origin harassment where the employer verbally and physically abused the plaintiff because of his race); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999) (finding a hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in

public by drawing a pair of breasts on an easel while the employee was making a presentation and then told the assembled group that "this is your training bra session," and where the employee received vulgar notes and was patted on the buttocks and told she was "putting on weight down there"); *Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes).

Here, Ms. Owens's comments fall short of the conduct described in numerous Ninth Circuit opinions where no hostile work environment was found. *See Manatt v. Bank of Am.*, 339 F.3d 792 (9th Cir. 2003); *Vasquez*, 349 F.3d at 642-44 (9th Cir. 2003) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir.2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031, 1036-37 (9th Cir. 1990) (affirming the district court's decision that no reasonable jury could have found a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino)). For instance, in *Manatt v. Bank of America*, the plaintiff, who was a Chinese American, overheard a number of conversations in which fellow employees used the phrase "China man" and referred to "communists" and "rickshaws." 339 F.3d at 795. She was mocked by her coworkers, who "pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians." *Id.* She also was told that her pronunciation of the word "Lima" was "ridiculous," was asked to repeat the pronunciation for others to hear, and had her co-workers explain her pronunciation by saying "that's because she's a China woman." *Id.* at 795-96. While the Ninth Circuit said it was "troubled" by the comments and "racially offensive" acts of the plaintiff's coworkers, given that the incidents

occurred only a few times over two and a half years and were directed at her only rarely, it found that the actions of the plaintiff's coworkers generally fell into the "simple teasing" and offhand comments" category of non-actionable discrimination because it was not severe or pervasive enough to alter the conditions of her employment. *Id.* at 798-99. Accordingly, the Ninth Circuit upheld the district court's grant of summary judgment in favor of the defendant. *Id.* at 795.

Here, while Ms. Owens made racially insensitive comments on a handful of occasions, her comments simply do not rise to the level required under the applicable case law. They were less severe than those described in *Manatt*, were offensive utterances rather than physical threats or comments intended to humiliate Mr. Brewer, and there is no evidence suggesting that they unreasonably interfered with his work performance. In short, from the evidence presented, the court does not believe that Mr. Brewer's workplace was permeated with discriminatory intimidation, ridicule, and insult. Instead, Ms. Owens sometimes made comments that engendered offensive feelings but did not alter Mr. Brewer's terms and conditions of employment sufficiently to create a hostile work environment. Accordingly, the court **GRANTS** GNC's motion for summary judgment with respect to Mr. Brewer's claim for a hostile work environment. And because his claim for failure to prevent discrimination is based upon his race and age discrimination claims, and all of those claims fail, the court also **GRANTS** GNC's motion for summary judgment with respect to Mr. Brewer's claim for failure to prevent discrimination.

### III. MR. BREWER'S RETALIATION AND WRONGFUL TERMINATION CLAIMS

Mr. Brewer also brings claims for retaliation in violation of the California Labor Code and for retaliation and wrongful termination in violation of California public policy. Because Mr. Brewer's retaliation and wrongful termination claims all are based upon his complaints about GNC's wage-and-hour violations, the court addresses all three claims together below.

GNC argues that Mr. Brewer cannot make out a prima facie case or show that its reasons for terminating him were pretextual. *See* Motion, ECF No. 52 at 17-18; Reply, ECF No. 8-14. "When a plaintiff alleges retaliatory employment termination either as a claim under the FEHA or as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden shifting analysis of [*McDonnell Douglas*] to

determine whether there are triable issues of fact for resolution by a jury." *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108-09 (Cal. Ct. App. 2007) (citing *Caldwell v. Paramount Unified School Dist.*, 41 Cal. App. 4th 189, 202-03 (Cal. Ct. App. 1995). In the first stage, the "plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Id.* (citing *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). If the employee successfully establishes these elements, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. *Id.* (citing *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 68 (2000)). If the employer meet its burden, the presumption of retaliation "drops out of the picture," and the burden shifts back to the employee to provide "substantial responsive evidence" that the employer's proffered reasons were untrue or pretextual. *Id.* (quoting *Yanowitz*, 36 Cal. 4th at 1042, and *Martin v. Lockheed Missiles & Space Co.*, 29, Cal. App. 4th 1718, 1735 (Cal. Ct. App. 1994)) (internal citation and quotation marks omitted). *See also Vasquez*, 349 F.3d at 646 (9th Cir. 2003) (applying the same standard).

In his opposition, Mr. Brewer contends that he has made a prima facie case because he has shown (by way of Judge Gonzales Rogers's certification of a related class action against GNC for wage-and-hour violations) that his complaints about wage-and-hour violations was reasonable. *See* Opposition, ECF No. 63 at 15-16. He then says, without citation, that Ms. Murray retaliated against him for making these complaints when she terminated him. *Id.* at 16.

This does not suffice to meet his burden. Most obviously, Mr. Brewer has completely failed to provide evidence showing a causal link between his complaints about wage-and-hour violations and his termination. As the court described above, Mr. Brewer testified at his deposition that he complained to Ms. Owens, Mr. Lebreton, and Ms. Murray about the wage-and-hour violations he suffered. He did not specify when he made these complaints. There is no evidence suggesting that any of these individual had anything to do with the decision to terminate Mr. Brewer. Mr. Brewer does not contend that Ms. Owens or Mr. Lebreton contributed to the decision to terminate him. And although the decision to terminate Brewer was communicated to him by Ms. Murray, there is no

evidence in the record that Ms. Murray had anything to do with making that decision. In fact, there does not even appear to be any evidence in the record at all about who decided to terminate him. Without knowing who made the decision to terminate him, Mr. Brewer cannot show that that person had any knowledge about his wage-and-hour violation complaints and that there was a link between the decision to terminate him and that those complaints. Moreover, at no time during his conversation with Ms. Stennerson (and Ms. Naranjo) did Mr. Brewer tell Ms. Stennerson that he had made complaints about not getting reimbursed for making bank deposits or for gas expenses. Mr. Lebreton also did not tell Ms. Stennerson that Mr. Brewer had ever complained that he had not been reimbursed for business expenses or otherwise had not been paid for wages which were owed. And Ms. Stennerson did not speak to Ms. Murray during the course of her investigation, and in fact she never spoke to Ms. Murray about Mr. Brewer in any respect either before or after her investigation.[9]

In short, Mr. Brewer fails to show that anyone having anything to do with his termination knew about his wage-and-hour violation complaints. Without some evidence about this, he cannot show that there was a causal relationship between his complaints and his termination. The court finds that he has not made his required prima facie showing. Accordingly, the court **GRANTS** GNC's motion for summary judgment with respect to Mr. Brewer's claims for retaliation and wrongful termination.

## CONCLUSION

Based on the foregoing, the court **GRANTS** GNC's motion for summary judgment with respect to all of Mr. Brewer's claims.[10]

---

[9] In his opposition, Mr. Brewer also argues that GNC's reasons for terminating him were pretextual. *See* Opposition, ECF No. 63 at 16-17. Because the court concludes that he did not meet his prima facie case, the analysis does not even get here. Nonetheless, the court does state that it finds Mr. Brewer's argument that the temporal proximity between his wage-and-hour complaints and his termination suggests pretext is unpersuasive. First, in his deposition testimony, Mr. Brewer never specified when he complained to Ms. Owens, Mr. Lebreton, and Ms. Murray about these violations. To the extent that he contends that he made complaints three months before being terminated, see id. at 16, there is nothing in the record to support this. While he did testify to complaining to his superiors in February 2011 about resolving a pay check issue, *see* Brewer Depo. at 94:1-23, this did not have anything to do with wage-and-hour violations.

[10] Because the court grants GNC's motion with respect to all of Mr. Brewer's substantive claims, the court need not address GNC's arguments that he should not be able to seek punitive

**IT IS SO ORDERED.**

Dated: April 4, 2014

_____
LAUREL BEELER
United States Magistrate Judge